595 A.2d 568

LIONSHEAD WOODS CORPORATION, PLAINTIFF, v. KAPLAN BROTHERS, KAPLAN AND SONS CONSTRUCTION CORP., KAPLAN AT LAKEWOOD, INC., TRADING AS FOUR SEASONS, AND THE TOWNSHIP OF LAKEWOOD, DEFENDANTS.

Superior Court of New Jersey
Law Division Ocean County

Decided July 29, 1991.

*William J. O'Hagan, Jr.,* for plaintiff (*Stout & O'Hagan,* attorneys).

*Steven I. Pfeffer* for defendants, Kaplan Brothers, Kaplan and Sons Construction Corp. and Kaplan at Lakewood, Inc., trading as Four Seasons (*Levin, Shea, Pfeffer & McMahon,* attorneys).

*Norman D. Smith* for defendant, Township of Lakewood.

SERPENTELLI, A.J.S.C.

In this action in Lieu of Prerogative Writs the plaintiff, Lionshead Woods Corporation, seeks to overturn a zoning ordinance amendment adopted by the Township of Lakewood on March 9, 1989.

The plaintiff is the owner of approximately 70 acres located within a R–20 residential zone in the southeast quadrant of Lakewood. The property abuts on all sides the R–40 zone which consists of 603 acres. Defendant, Kaplan [1], is the owner of approximately 408 of those acres located largely on the westerly side of Shorrock Street. The Township of Lakewood owns the remaining 195 acres in the R–40 zone. The 603 acre tract was originally located in a R–20 zone until the R–40 zone was created by an ordinance adopted on May 24, 1984.

At the time that Kaplan acquired its property by public sale on September 13, 1984, the R–40 zoning permitted single family residences, places of worship, schools, public buildings and adult communities. As it related to the adult communities, the zoning allowed detached single family dwellings at a density of four units per acre. After the closing of title, Kaplan requested an amendment to the R–40 regulations. On May 23, 1985, the township changed its ordinance to increase the density from four to six units per acre. Furthermore, under the new ordinance residential structures in an adult community could be any of six types, namely, single family detached, patio homes, duplexes, multiplexes, townhouses and midrises containing up to six residential stories.

The plaintiff challenged the amendment and obtained a judgment on July 29, 1986, declaring the ordinance invalid because of a conflict of interest of one of the committee persons. That decision was affirmed by the Appellate Division. A petition for certification to the Supreme Court was denied.

---

[1]The several Kaplan defendants are hereinafter referred to collectively as "Kaplan" or "defendant".

Pending the outcome of the appeal, Kaplan proposed a modified ordinance with minor changes. It was adopted on March 5, 1987. In response, the plaintiff again filed suit. On February 15, 1989, this court entered judgment setting aside the second amendatory ordinance finding that certain sections were invalid and not severable.

Thereafter, technical revisions of the ordinance were made in an effort to harmonize it with the court's ruling. It was readopted by the township on March 9, 1989. It is this latest version which is the subject of the present controversy.[2]

■ Lionshead offers several arguments to support its claim of invalidity. Plaintiff first alleges that the ordinance is so ambiguous that it is void. Principally attacked is that portion of Section 18–12.8(a)(5)(f) which provides:

Notwithstanding anything contained herein to the contrary, no more than *33 percent of any adult community project* shall consist of midrise structures. [emphasis added]

Plaintiff claims that this language is subject to at least three different interpretations. It reasons that the 33 percent limitation could apply to the number of midrise *structures* in an adult community project, to the number of *units* within midrise structures in an adult community project or to the land *area* allocated to midrises within an adult community project.[3] Plaintiff insists that the ordinance is impermissibly vague be-

---

[2]The court decided an *in limine* motion to declare the entire zoning ordinance presumptively invalid for failure to comply with *N.J.S.A.* 40:55D–89, which requires periodic review of the master plan. The court's decision is reported at 243 *N.J.Super.* 678 (Law Div.1990). The issue was moot at trial because the township revised its master plan between the date of the decision and the time of trial.

[3]The court assumes the word "area" equates to the acreage occupied by the midrise structures themselves, the area between buildings and all required setbacks. It has been suggested that "area" may mean only the space contained within the footprint of each building. If that is the intended meaning, the plaintiff's claim of ambiguity receives additional support since that interpretation is neither evident in the ordinance nor customary in the lexicon of land use law.

cause it lacks clear standards to guide either an applicant for development or the local officials who must administer it. Additionally, plaintiff asserts that the section is not severable and, therefore, the entire ordinance amendment must be declared invalid.

The defendants maintain that the disputed section can be read in only one way to apply to the total number of *units* since the ordinance measures gross density in terms of units. Moreover, defendants argue that even if the court should determine that the provision is invalid, the balance of the ordinance should not be stricken. Defendants rely upon an omnibus severability clause contained within the codified Lakewood Township ordinances which states:

> If any chapter, section, subsection or paragraph of this revision shall be declared to be unconstitutional, invalid or inoperative, in whole or in part, by a court of competent jurisdiction, such chapter, section, subsection or paragraph shall, to the extent that it is not unconstitutional, invalid or inoperative, remain in full force and effect, and no such determination shall be deemed to invalidate the remaining chapters, sections, subsections or paragraphs of this revision. [Chapter 1, Section 1–4]

The law is well settled that a zoning ordinance must be clear and explicit in its terms, setting forth sufficient standards to prevent arbitrary and indiscriminate interpretation or application by local officials. McQuillin summarizes the guiding principles as follows:

> As other ordinances, zoning ordinances are required to be reasonably definite and certain in terms so that they may be capable of being understood. The boundaries or limits of zones or district (sic) must be clearly and definitely fixed, and the restriction on property rights in the several zones must be declared as a rule of law in the ordinance and not left to the uncertainty of proof by extrinsic evidence. The rule of certainty and definiteness of zoning ordinances verges on or is identical with the rule that they must establish a clear rule or standard to operate uniformly and govern their administration, in order that arbitrariness and discrimination in administrative interpretation and application be avoided. [8 *McQuillin, Municipal Corporations* (3d ed. 1991), Sec. 25.59]

These tenets have been adopted in a large number of New Jersey decisions. *Morristown Rd. Assocs. v. Mayor of Bernardsville*, 163 *N.J.Super.* 58, 63, 394 *A.*2d 157 (Law Div.1978); *J.D. Constr. Corp. v. Board of Adjustment of Freehold*, 119

*N.J.Super.* 140, 149, 290 *A.*2d 452 (Law Div.1972); *Township of Maplewood v. Tannenhaus*, 64 *N.J.Super.* 80, 89, 165 *A.*2d 300 (App.Div.1960), *cert. denied*, 34 *N.J.* 325, 168 *A.*2d 691 (1961); *Schack v. Trimble*, 48 *N.J.Super.* 45, 53, 137 *A.*2d 22 (App.Div. 1957), *aff'd*, 28 *N.J.* 40, 145 *A.*2d 1 (1958); *Hrycenko v. Board of Adjustment of Elizabeth*, 27 *N.J.Super.* 376, 379, 99 *A.*2d 430 (App.Div.1953); *Jantausch v. Borough of Verona*, 41 *N.J.Super.* 89, 104, 124 *A.*2d 14 (Law Div.1956), *aff'd*, 24 *N.J.* 326, 131 *A.*2d 881 (1957).

A zoning ordinance must be reasonably precise so that property owners may understand the restrictions that are imposed upon the use of their land. The right of a landowner to utilize property should not depend upon the "outcome of litigation after the event in which a provision, which he apparently fully meets, assumes a new and different significance by a process of refined interpretation." *Jantausch, supra*, 41 *N.J.Super.* at 104, 124 *A.*2d 14.

The importance of these rules, within the context of the case before the court, is best illustrated by *J.D. Construction Corp. v. Board of Adjustment of Freehold, supra*, a case factually similar to this litigation. In *J.D. Construction*, the challenged zoning ordinance provided that the total number of individual apartment units in all apartment projects in Freehold could not exceed 15 percent of the total number of single family residences situated in the township. The plaintiff argued that the ordinance contained insufficient standards to govern its application. It noted that the section under attack did not specify how the ratio was to be formulated and that the zoning officials would be allowed to devise that procedure indiscriminately, thereby creating the possibility that the actual method chosen could be arbitrary.

Judge Lane agreed, finding that the ordinance did not stipulate how the available number of apartment units was to be calculated. The number of single family residential units was determined by counting the number of certificates of occupancy

which had been issued. However, the number of existing apartment units had not been defined in that fashion. Rather, the number was arrived at by ascertaining how many special exceptions [4] had been authorized by the board of adjustment. The court found that an application for an apartment project might be denied because the tally of apartment units could include units which were authorized but never constructed. Thus, the court decided that there was no rational basis for the method by which the number of available apartment units was established. In short, the ambiguity in the ordinance invited official interpretation or effectuation of procedures which could be arbitrarily devised or changed.

The court in *Morristown Road Associates, supra,* reached the same conclusion after reviewing a zoning amendment enacted to promote development design standards. The plaintiff argued that the design review process devised by the borough's ordinance called for the exercise of such subjectivity as to invite arbitrary administration and unbridled discretion by the reviewing agency. The plaintiff asserted that the standards offered no reasonable or workable guidelines to an applicant for site plan approval nor to the officials who had to pass upon the application. Reiterating the principles discussed earlier in this opinion, the court referred to a Florida Supreme Court decision which said:

> ... When regulations are to be imposed in order to promote health, welfare, safety and morals it is necessary that exactions be fixed in the ordinance with such certainty that they not be left to the whim or caprice of the administrative agency.... [*Morristown Rd. Assocs.,* 163 *N.J.Super.* at 65, 394 *A.*2d 157 (quoting *City of West Palm Beach v. State,* 158 Fla. 863, 30 So.2d 491 (Sup.Ct.1947))]

In the case before this court, the plaintiff presented the testimony of three witnesses concerning the challenged section. Dr. Ivan Metzger and Thomas Thomas, both licensed planners, and Joseph Martin, a real estate broker and appraiser, all

---

[4]In present parlance, special exceptions are known as conditional use variances. *N.J.S.A.* 40:55D–67.

concurred that the ordinance was subject to three interpretations because at least three different criteria could be used to give meaning to the debated section. Dr. Metzger presented exhibits which visualized the consequences of applying the 33 percent provision in terms of units, structures or area. Five land use studies depicted examples of different configurations, numbers, and types of buildings which could be achieved depending on the criterion utilized in site planning. The results varied dramatically.

Dr. Metzger's testimony was premised on the fact that the ordinance allowed a gross density of six units per acre which would provide a maximum of 2,448 units for Kaplan's 408 acre parcel. He gave three examples of development employing *units* as the criterion. Land use study A portrayed 18 midrise buildings containing a maximum of 46 units per building for a total of 816 units, which is one-third of the 2,448 units permitted. Study B did not differ significantly other than in the location of the structures. Study C pictured 36 midrise buildings containing up to 23 units per building which created the same total number of units. This approach cut the size of the buildings in half and doubled the number of midrise structures. In studies A, B and C the other two-thirds of the project was devoted to 42 multiplexes with not more than 39 units per building creating 1,632 units.

Utilizing *area* as the measure, study D showed 56 midrises containing a maximum of 44 units per building. This analysis produced 2,446 units all on one-third of the property owned by Kaplan. The other two-thirds of the area was occupied by two single family homes.

Finally, using *structures* as the norm, study E depicted one large building accommodating 2,446 units, leaving the other two-thirds of the project for two single family homes. Land use studies D and E were, in the court's view, worst case examples demonstrating how far the structures and area criteria could be taken. They did not purport to describe the only

available options for, if so, they would have been untenable. As the ordinance is drawn, any combination of uses can be constructed subject only to the condition that midrises do not constitute more than one-third of the standard chosen.

Many options are available within each criterion which could yield an arguably reasonable arrangement. For example, land use study A contains 18 midrises and 42 multiplexes. It illustrates a site plan based on units. However, that study also constitutes a compliant scheme using either structures or area as the guideline. The 18 midrises comprise less than one-third of the total structures and consume less than one-third of the total area.

Another example illustrates the importance of clearly identifying the criterion which is to govern. Extrapolating from the land use studies submitted, it appears that a project could be designed which would accommodate approximately 38 midrises containing 44 units each within one-third of the land area and 20 multiplexes housing 37 units each within the remaining two-thirds of the tract. That strategy would satisfy the area test but not the units or structures parameters since the midrise units would be more than one-third of the total units and the midrise structures would be more than one-third of the total structures. Yet, the proposal could be considered appropriate and accord with the ordinance if the local officials rule that the 33 percent limitation relates to area.

Kaplan's expert, Daniel McSweeney, a licensed planner, conceded that three interpretations are possible but he maintained that it does not make sense to use either structures or area as the benchmark. However, he did little to support that conclusion. His testimony was confined largely to criticizing land use studies D and E as aesthetically offensive and unsound from a site planning perspective. He failed to explain why configurations different than studies D and E but still utilizing structures or area as the polestar could not achieve a sensible outcome. In fact, he did not take issue with land use study A

since it was based on the units approach but he neglected to acknowledge that it also complied with the other two standards.

Concededly, the court in construing the ordinance should presume that the legislative body intended to act reasonably and, if possible, the ordinance should be so construed. *Roman v. Sharper*, 53 *N.J.* 338, 341, 250 *A.*2d 745 (1969). Certainly, the court should not presume that the governing body sought an absurd result. *State v. Gill*, 47 *N.J.* 441, 444, 221 *A.*2d 521 (1966) (citing *Robson v. Rodriquez*, 26 *N.J.* 517, 528, 141 *A.*2d 1 (1958)). In some instances, a choice must be made from more than one imperfect construction. In those circumstances the option should be selected which most comports with the probable legislative purpose. *County of Monmouth v. Wissell*, 68 *N.J.* 35, 43, 342 *A.*2d 199 (1975). Unlike *County of Monmouth*, there is no legislative history to guide analysis nor even a hint of the governing body's thinking anywhere in the record. While the court should strive to find the likely intent of the legislators, it does not have the freedom to choose between more than one *reasonable* interpretation of the ordinance if ambiguity, vagueness or the absence of legislative history prevents it from making a rational selection. It is one thing to save the ordinance by inferring a suitable intent, particularly when evidence of the legislators' goal is available. It is another to pick—in a vacuum—one of several logical alternatives which could have widely disparate consequences when applied. In the latter circumstance, the court should not rewrite the ordinance, run the risk of misconstruing the legislative objective and possibly create an outcome the lawmakers never intended. *Bow & Arrow Manor, Inc. v. Town of West Orange*, 63 *N.J.* 335, 343, 307 *A.*2d 563 (1973); *Jantausch, supra*, 41 *N.J.Super.* at 104, 124 *A.*2d 14.

In this case, it cannot be said that the designation of units, structures or area as the measurement for the 33 percent stipulation is inherently unsensible. Put another way, any of these yardsticks could be employed and be sustained within the context of the ordinance before the court. Under those circum-

stances, the ordinance has created the very evils which have been proscribed by our cases. The applicant is denied a definite standard with which to comply and the enforcing officials are granted unbridled discretion in executing this stricture. Thus, the court holds that Section 18–12.8(a)(5)(f) is impermissibly vague and ambiguous.

 The court also concludes that this defective provision is not severable and, consequently, the entire amendment is invalid. The presence of the severability clause in the general codification of the Lakewood ordinances is not determinative. The principles relating to the doctrine of severability are well established. In *Angermeier v. Borough of Sea Girt,* 27 *N.J.* 298, 142 *A.*2d 624 (1958), the Supreme Court stated them as follows:

> The principle of separability is in aid of the intention of the lawgiver. The inquiry is whether the lawmaking body designed that the enactment should stand or fall as a unitary whole. It is not enough that the act is severable in fact; its severability in the event of partial invalidity must also have been within the legislative intention. It is a question of interpretation and of legislative intent whether the particular provision is so interwoven with the invalid clauses as that it cannot stand alone. A severability clause.... 'provides a rule of construction which may sometimes aid in determining that intent. But it is an aid merely; not an inexorable command.' [citation omitted] [27 *N.J.* at 311, 142 *A.*2d 624]

*See also State v. Lanza,* 27 *N.J.* 516, 527–28, 143 *A.*2d 571 (1958); *Inganamort v. Borough of Fort Lee,* 72 *N.J.* 412, 422–23, 371 *A.*2d 34 (1977).

In light of these maxims, can it be said that the governing body would have intended that the ordinance survive a finding that the 33 percent requirement is invalid?

As noted at the outset of this opinion, prior to the enactment of the 1985 zoning ordinance amendment, the uses permitted in the R–40 zone generally conformed with the residential zoning for other adult communities in Lakewood. The undisputed evidence at trial established that in the vicinity of the R–40 zone, there are approximately 5,000 single family residential units most of which are in adult communities. Many of them

are located in Lakewood and others are in the adjacent communities of Dover Township and Brick Township. All of them are single story residences in either single, duplex or quadraplex configurations. The only multi-story residential structure near the R–40 zone is located in Lakewood in the B–5 business zone immediately adjacent to Route 70, a major four lane east-west highway.

When adopting the 1985 amendment allowing a variety of uses in the R–40 zone including midrises up to 65 feet high, the governing body had to be cognizant that it was introducing a use of an entirely different character into the area. For whatever reason, it consciously chose to restrict the quantum of that use by imposing a 33 percent qualification. If the court declares the condition invalid and yet severs that clause, the effect could be to allow the R–40 zone to be developed to its maximum density with midrise structures only. That solution would be inconsistent with the express purpose of the ordinance and the evident intent of the legislators which was to confine the extent of midrise use to 33 percent of any project developed within the zone, whether the 33 percent referred to units, structures or area. Therefore, the court is compelled to find that the limitation is not severable. The amendment must fall in its entirety.

Parenthetically, the court notes that severing the provision and letting the balance of the ordinance stand could substantially impact on another argument made by plaintiff that the allowance of midrises in the R–40 zone is arbitrary, capricious or unreasonable. Both the township and Kaplan stressed that the 33 percent restriction had a mollifying effect on the introduction of a new land use within the neighborhood. They asserted that the 33 percent constraint, strategic placement of the midrise buildings and sensitive site planning would guarantee that the 65 foot structures would not be out of keeping with the character of adjacent uses. That argument might be lost if all of the R–40 zone could be developed with midrise structures.

However, the court need not address the issue of arbitrariness since its finding of inseverability is dispositive. The court chooses not to consider the other issues raised by the plaintiff. Given the history of the litigation, it is likely that this case will be revisited and that those issues could either disappear or reappear in a different form in light of the amendment which the township may undertake as it evaluates the court's ruling and the other ordinance defects exposed during trial.

Additionally, the court declines to rule in the abstract on the other issues with the hope that the next effort at amendment of the ordinance will be careful and detailed as opposed to a mere technical tinkering to meet what is perceived to be the minimum change necessary to pass judicial scrutiny. To date, the ordinances which have been brought to the court have been seriously lacking both in form and substance. For example, in some instances the court found it extremely difficult to discern the governing body's intent because of the haphazard manner in which the sections and subsections of the ordinance have been numbered. That inadequate draftsmanship could have affected the court's ruling with respect to the argument made by plaintiff that the ordinance lacks standards to control uses for the adult community project, particularly commercial accessory uses.

Plaintiff's counsel may submit an order declaring the amended ordinance of March 9, 1989 invalid for the reasons expressed above.